UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
JOHN JOHNSON,                                    :
                                                 :    Civil Case No.
                        Plaintiff,               :
                                                 :
        v.                                       :    **COMPLAINT**
                                                 :
EDWARD J. YOUNG, INC., d/b/a STANLEY             :
STEEMER CARPET CLEANERS, and                     :    **Jury Trial Demanded**
EDWARD J. YOUNG and KEITH BURTIS, each           :
in their individual and professional capacities, :
                                                 :
                        Defendants.              :
------------------------------------------------------------------ x

Plaintiff John Johnson hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      At a time when the #MeToo and TIME'S UP movements have pushed for heightened focus on the mistreatment of women and the need to hold men accountable for acts of sexual harassment, Defendants Edward J. Young, Inc., d/b/a Stanley Steemer (the "Company"), Edward J. Young and Keith Burtis (together "Defendants"), have taken the opposite approach. Plaintiff John Johnson was a 22-year employee for Defendants, owners and operators of a Stanley Steemer franchise, who spoke up to complain about Michael Emerson – a 52-year old supervisor – sexually harassing his daughter and niece, both of whom are more than 30 years younger than Mr. Emerson and worked there part-time.  Mr. Emerson's sexually harassing behavior included calling them "bitches," constant sexual innuendo, and even grabbing and touching their breasts and butt without consent.  After Mr. Johnson complained about this harassment, he found himself outside the good graces of the Company's owners – Mr. Young and Mr. Burtis – who sided with Mr. Emerson.  Mr. Burtis, who perhaps shares a kinship with Mr. Emerson – because Mr. Burtis also refers to employees and customers using highly offensive

1

terms – ultimately fired Mr. Johnson for the stated reason that he was "no longer needed" after more than two decades with the Company.

2.     Accordingly, Plaintiff brings claims against Defendants for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* (the "NYSHRL") and the anti-retaliation provisions of the New York Labor Law, N.Y. Labor Law §§ 190 *et seq.* ("NYLL").

## JURISDICTION AND VENUE

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment and civil rights practices alleged herein, occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

5.     On March 22, 2018, Mr. Johnson filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation for his unlawful termination after he engaged in a protected activity by complaining that his daughter and niece were being harassed by an employee of Defendant Edward J. Young, Inc.

6.     On May 8, 2018, the EEOC issued a Notice of Right to Sue.  This Complaint has been filed within 90 days of Mr. Johnson's receipt of the Notice of Right to Sue.

7.     Any and all other administrative perquisites have been met.

## **PARTIES**

8. Plaintiff John Johnson is a former employee of Edward J. Young, Inc. Mr. Johnson was employed at Edward J. Young, Inc. for 22 years, from January 1996 through December 12, 2017. Mr. Johnson is a resident of the State of New York, and at all relevant times met the definition of an "employee" under all applicable statutes.

9. Defendant Edward J. Young, Inc. is a New York professional corporation with a principal place of business at 171 Brook Ave, Deer Park, NY 11729. At all relevant times, Defendant Edward J. Young, Inc. met the definition of an "employer" under all applicable statutes.

10. Defendant Edward J. Young is a co-owner of Edward J. Young, Inc. At all relevant times, Defendant Edward J. Young had the authority to discipline and fire Plaintiff, direct his work activities, assign his job responsibilities and monitor his performance. Accordingly, at all relevant times, Defendant Edward J. Young was an "employer" within the meaning all applicable statutes.

11. Defendant Keith Burtis is a co-owner of Edward J. Young, Inc. At all relevant times, Defendant Keith Burtis had the authority to discipline and fire Plaintiff, direct his work activities, assign his job responsibilities and monitor his performance. Accordingly, at all relevant times, Defendant Keith Burtis was an "employer" within the meaning of all applicable statutes.

**FACTUAL ALLEGATIONS**

**Background**

12. Edward J. Young, Inc. is a Stanley Steemer franchise owned by Defendants Edward J. Young and Keith Burtis, based out of Long Island, New York, that provides professional cleaning services throughout Long Island and New York City.

13. In January 1996, at age 23, Mr. Johnson started working for the Company as an Assistant Cleaner, and has been a part of the fabric of the Company ever since.

14. During his tenure, Mr. Johnson advanced through the Company, earning promotions from Assistant Crew Chief to Crew Chief, to Supervisor, to Assistant Manager and ultimately in 2010, to General Manager.

15. As General Manager, Mr. Johnson's responsibilities included interviewing, hiring and training new employees, addressing customer complaints, scheduling jobs, ensuring that all jobs were completed to the customer's satisfaction and managing the Company's employees.

16. Mr. Johnson's 22-year tenure alone speaks for itself in terms of his value and importance to the Company.

17. In or around March 2015, the Company hired Mr. Johnson's daughter, then 15 years old (the "Daughter").

18. Approximately two months later, in or around May 2015, the Company hired Mr. Johnson's niece, 18 years old at the time, as well (the "Niece").

19. Mr. Johnson's Daughter and Niece were both hired as Customer Service Assistants and their job duties included answering phones, booking jobs, answering customer questions, confirming jobs for the following day and following up to locate crew members while they worked off-site.

20. Mr. Johnson's Daughter and Niece generally worked at the Company on Saturdays, afterschool during the week, during summers and other times when school was not in session.

21. During their employment, Mr. Johnson's Daughter and Niece were subjected to a near-endless array of sexual, offensive and racist conduct at the hands of Michael Emerson, the Company's dispatcher and their direct supervisor.

22. By way of example only, Mr. Emerson frequently referred to Mr. Johnson's Daughter and Niece as "bitches."

23. Mr. Emerson also referred to Mr. Johnson's Daughter and Niece's boyfriends using racist terms such as "rice patty boy" and "pizza boy," due to their Vietnamese and Italian heritages, respectively. Mr. Emerson also told Mr. Johnson's Niece that her boyfriend "should go back to Vietnam."

24. Mr. Emerson would make sexual comments to Mr. Johnson's Daughter on a regular basis, such as that her boyfriend was "going to give her his Italian Sausage," and other references to Mr. Johnson's Daughter's sex life with her boyfriend.

25. Mr. Emerson told Mr. Johnson's Daughter and Niece that "those are boys and I'm a man," insinuating that he would be a better sexual experience for these young women than their age-appropriate boyfriends.

26. Over time, Mr. Emerson's harassing conduct got progressively worse. By way of example only, Mr. Emerson's conduct graduated from language to non-consensual touching – he touched Mr. Johnson's Daughter and Niece on their buttocks and breasts.

27. Mr. Emerson's offensive, sexist and bigoted conduct towards Mr. Johnson's Daughter and Niece is consistent with his discriminatory conduct and language towards others.

28. By way of example, Mr. Emerson routinely uses sexist language towards others, such as referring to women as "bitches," "whores" and "cunts" and making sexually suggestive comments such as "If you were looking for your wife, she was with me last night."

29. Mr. Emerson also uses the most offensive slurs one can imagine about virtually every disadvantaged racial, ethnic and religious group, such as "cheap Jews," "spics," "jigaboos," "Orientals," "niggers" and "gooks." Mr. Emerson uses these terms when referring to customers and co-workers.

30. Mr. Emerson frequently uses the phrase, "I'll punch her in the tits!" when referring to a woman – customer or employee – who has done something he does not like.

31. Mr. Emerson also frequently uses the phrase, "look it's JJ and BJ," when referring to Mr. Johnson and an African American co-worker with the same last name. According to Mr. Emerson, the term "BJ" was short for "Black Johnson," and he rejoiced in using "BJ" in a derogatory manner when referring to his African American co-worker.

**Mr. Johnson's Protected Complaints of Sexual Harassment**

32. On June 2, 2017, Mr. Johnson learned the extent and nature of Mr. Emerson's treatment of his Daughter and Niece and that they no longer felt comfortable working at the Company due to the severity and pervasiveness of his conduct.

33. Later that same day, Mr. Johnson did what any responsible father and uncle would do – he sat down with Lisa Ryan, the Office Manager, to report the sexual harassment and inform Ms. Ryan that his Daughter and Niece would no longer be working there because it was an unsafe place for them to work.

34. Ms. Ryan shrugged her shoulders and told Mr. Johnson to bring his concerns to Mr. Young, co-owner of the Company.

35. The next day, on June 3, 2017, Mr. Johnson complained to Mr. Young about Mr. Emerson's sexual-harassing conduct and the unsafe work environment in hopes that Mr. Young would address the issue and admonish Mr. Emerson.

36. However, Mr. Young, without conducting any investigation whatsoever, told Mr. Johnson simply: "I don't buy it."

37. Mr. Young further said, "[i]f it were me, I would have confronted [Mr. Emerson]," encouraging Mr. Johnson to provoke an altercation with a co-worker, and implying that by speaking with the Office Manager and Owner to address the issue was somehow evidence that Mr. Johnson was lying.

38. Later that day, Mr. Johnson confronted Mr. Emerson and, unsurprisingly, he denied engaging in any of the harassing conduct.

39. The Company never conducted any investigation into Mr. Johnson's complaint.

40. Mr. Young never conducted any investigation into Mr. Johnson's complaint.

41. Mr. Burtis never conducted any investigation into Mr. Johnson's complaint.

42. Mr. Emerson was never disciplined in any manner, as a result of or in response to the complaints of misconduct raised by Mr. Johnson.

**Unlawful Retaliation Following Protected Complaints**

43. Immediately after Mr. Johnson complained about Mr. Emerson's sexual harassment of his Daughter and Niece, he became a target of further harassment and retaliation.

44. By way of example, within a week of Mr. Johnson's complaints, Ms. Ryan reprimanded him saying, "I can't believe [your Daughter and Niece] accused [Mr. Emerson] of such terrible things," and "your niece made horrible allegations about [Mr. Emerson] that aren't

7

true." Afterwards, Ms. Ryan never spoke to Mr. Johnson again, even though they saw each other constantly.

45. Moreover, on June 10, 2017, the Company failed to grant Mr. Johnson bereavement leave and compensate him for taking the day off to attend his nephew's funeral, as had been customary in the past and had been provided to other employees who had not raised complaints of harassment.

46. Furthermore, Mr. Young began to refuse to speak to Mr. Johnson, and their once cordial relationship dwindled to the point where he would hand Mr. Johnson his daily work assignments on a pad and only speak to Mr. Johnson to clarify those assignments. Prior to Mr. Johnson's complaint, Mr. Johnson and Mr. Young routinely conversed throughout the workday.

47. Generally speaking, Mr. Johnson was subjected to a hostile and retaliatory work environment following his complaint against Mr. Emerson for sexually harassing his Daughter and Niece.

48. On December 12, 2017, the Company's retaliatory animus culminated with Mr. Johnson's unlawful termination.

49. On that date, Mr. Young and Mr. Burtis called Mr. Johnson into a meeting and told him that "the company has to make some changes," and that he was being let go.

50. It strains all bounds of credibility that the Company would – after 22 years – decide it needed to make the change of getting rid of Mr. Johnson.

51. Of course, Mr. Emerson – who harasses employees and engages in racist and bigoted conduct – still has his job at the Company.

**Culture of Bigotry and Harassment at the Company**

52. Unfortunately, Mr. Emerson's conduct is not an anomaly, but a manifestation of a Company where unlawful conduct runs rampant and is acquiesced to by management.

53. In fact, Mr. Burtis's offensive conduct is a virtual mirror of Mr. Emerson's, as Mr. Burtis also uses slurs to target any racial, ethnic or religious group that is not his own.

54. Mr. Burtis has referred to Black people as "lazy niggers," Hispanic people as "Shady Spanish guys," Jews as being "cheap," Hassidic Jews as "hats," and has referred to one of Mr. Johnson's co-workers, as the "Muslim Tasmanian Devil."

55. Mr. Burtis often refers to anyone he does not like as "pieces of shit."

56. Mr. Burtis also set a similar example with respect to sex in the workplace. Mr. Burtis and Ms. Ryan have, over the years, flaunted their sexual relationship at the office. Upon information and belief, Mr. Burtis' conduct with Ms. Ryan in the workplace only further emboldened employees like Mr. Emerson to act in an inappropriate sexual manner towards employees in the workplace.

57. In short, Mr. Emerson's conduct emanates not only from his own discriminatory beliefs, but is the logical product of a company run without any legitimate leadership, and where leadership only contributes to the hostile environment for employees.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
*Against Defendant Edward J. Young, Inc.*

58. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

59. By the actions described above, Defendant Edward J. Young, Inc. retaliated against Plaintiff by unlawfully materially changing the conditions of his employment because he

made protected complaints regarding Defendants' unlawful and discriminatory treatment of other employees by, *inter alia,* terminating Plaintiff's employment.

60. As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer economic and emotional harm, for which he is entitled to an award of damages, including punitive damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
*Against All Defendants*

61. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

62. By the actions described above, Defendants retaliated against Plaintiff by unlawfully materially changing the conditions of his employment because he made protected complaints regarding Defendants' unlawful and discriminatory treatment of other employees by, *inter alia,* terminating Plaintiff's employment.

63. By the actions described above, Mr. Young and Mr. Burtis aided, abetted and actually participated in the unlawful conduct.

64. As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer economic and emotional harm, for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYLL)
*Against All Defendants*

65. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the

preceding paragraphs as if fully set forth herein.

66. By the actions described above, Plaintiff, reasonably and in good faith, made protected complaints regarding Defendants' failure to provide protection to the lives, health and safety of employees in violation of N.Y. Lab. Law § 200.

67. By the actions described above, Defendants retaliated against Plaintiff, in violation of N.Y. Lab. Law § 215, by unlawfully materially changing the conditions of his employment by, *inter alia*, terminating Plaintiff's employment because Plaintiff made the aforementioned complaints.

68. As a direct and proximate result of Defendants' willful violations of the NYLL, and Defendants' unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer economic and emotional harm, for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses, liquidated damages and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in his favor and against Defendants, through the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including

11

but not limited to, emotional pain and suffering and emotional distress;

  E. An award of liquidated damages;

  F. An award of punitive damages;

  G. An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorney's fees; and

  H. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 30, 2018
   New York, New York      Respectfully submitted,

                **WIGDOR LLP**

                By: _____
                  David E. Gottlieb
                  James C. Underwood III

                85 Fifth Avenue
                New York, NY 10003
                Telephone: (212) 257-6800
                Facsimile: (212) 257-6845
                dgottlieb@wigdorlaw.com
                junderwood@wigdorlaw.com

                *Counsel for Plaintiff*